FILED
2011 Feb-22  AM 09:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ROGER STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. CV-09-S-2207-NE |
| | ) | |
| AIR PRODUCTS AND | ) | |
| CHEMICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Roger Stevens, who is proceeding *pro se*, filed this case on October 30, 2009. He alleges that Air Products and Chemicals, Inc. ("Air Products"), his former employer, discriminated against him and terminated his employment because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[1]  The case currently is before the court on defendant's motion for summary judgment in its favor on all of plaintiff's claims.[2]  Upon consideration of the motion, the briefs, and the evidentiary submissions, the court concludes that defendant's motion should be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary

---

[1]*See* doc. no. 1 (Complaint).

[2]Doc. no. 11.

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the

---

[3] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Parties who appear *pro se* are afforded a leniency not granted to those who are represented by counsel.  *Cf., e.g.*, *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a *pro se* complaint filed by a state prisoner], 'however inartfully pleaded,' are held to 'less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (same); *Woodall v. Foti*, 648 F.2d 268, 271 (5th Cir. June 16, 1981)[4] ("A *pro se* complaint, however inartfully drafted, must be held to less rigorous standards than the formal pleadings prepared by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (quoting *Haines*).

---

[4]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Even so, the leniency accorded *pro se* litigants is not unqualified.  A *pro se* plaintiff "must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (citing *Brown v. Crawford*, 906 F.2d 667, 669-70 (11th Cir. 1990)).

## II. SUMMARY OF FACTS[5]

Plaintiff, Roger Stevens, was fifty-seven years old when his complaint was filed on October 30, 2009.[6]  He began working as a truck driver for defendant Air Products and Chemicals, Inc. ("Air Products"), in Decatur, Alabama, in May of 1995.[7]

Drivers at Air Products deliver loads of the company's products, including liquid oxygen, nitrogen, and argon, to customers in the manufacturing industry. Manufacturing plants have a particular need for Air Products' products to be

---

[5]Plaintiff did not respond, paragraph by paragraph, to any of defendant's proposed undisputed facts.  Therefore, all of defendant's proposed undisputed facts are deemed admitted.  *See* doc. no. 9 (Uniform Initial Order), at 16 ("*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (emphasis in original).  *See also* Fed. R. Civ. P. 56(e)(2).

[6]Plaintiff stated in his complaint that he was fifty-seven years old.  *See* Complaint, at 2. However, the court could not find any clear evidence of plaintiff's age.  Plaintiff was asked his birth date during his deposition, but defendant redacted his response from the copy of the deposition transcript that was filed in support of defendant's motion for summary judgment, presumably in an effort to protect plaintiff's privacy.  *See* doc. no. 11 (defendant's evidentiary submission), Exhibit 1 (Deposition of Roger Stevens), at 96-97.  Even though there is no clear evidence of plaintiff's age, defendant does not contest that plaintiff is old enough to fall under the protections of the ADEA, and, specifically, does not contest plaintiff's claimed age of fifty-seven years.

[7]Stevens Deposition, at 101-02.

4

delivered in a timely manner, so that they can keep production running smoothly and keep the plant itself operating.  If Air Products does not deliver the product to a manufacturing customer before the customer's supply runs out, then the company can be held liable to that customer for damages associated with loss of production.[8] Because timely deliveries are important to Air Products' business, the company employs an internal logistics group, referred to as "dispatch," to assign delivery schedules to its various drivers.  The dispatch office is centrally located at the company's headquarters in Allentown, Pennsylvania.[9]  Five employees from the dispatch office are exclusively assigned to coordinate driver schedules for the geographical region encompassing defendant's Decatur, Alabama facility.  Because these dispatch employees work exclusively in one geographical area, they specialize in knowing and meeting the needs of the customers in that area by arranging timely deliveries.[10]

Drivers select what days and times they work through a bidding process, which is based solely upon the drivers' seniority:  *i.e.,* the drivers with the most experience have the privilege of selecting the most favorable shifts.  Most drivers try to eliminate weekend work and bid on a start time that accommodates their own personal

---

[8]Defendant's evidentiary submission, Exhibit 3 (Affidavit of R. Mark Watkins), at ¶ 4.

[9]*Id.* at ¶ 2.

[10]*Id.* at ¶ 3.

circumstances.[11]  Within the date and time frame selected for each driver, the dispatch office assigns deliveries among the drivers based upon the customers' needs, the availability of different products, efficiency considerations, and regulations of the U.S. Department of Transportation.  Because these considerations vary on a daily basis, so do the drivers' schedules.  A driver rarely visits the same customer two days in a row, and he might deliver to certain customers much more frequently than to others.[12]

Drivers learn their trip assignments by checking a computer system when they arrive at work each morning.[13]  Drivers are paid by the mile and by the load.[14]  It is easier for drivers to earn money from mileage than from loading and unloading, so they generally prefer longer trips with shorter unloading times.  Plaintiff testified that, over an extended period of time, most drivers are assigned a fairly even number of "good" and "bad" trips, even though some drivers, including himself, might be assigned several "bad" trips in a row.[15]  When drivers are unsatisfied with their assignments, they often call the dispatch office directly to complain, although the

---

[11]Stevens Deposition, at 56-61.

[12]Watkins Affidavit, at ¶ 5.

[13]Stevens Deposition, at 201, 222.

[14]*Id.* at 115-16.

[15]*Id.* at 199-200.

6

proper procedure is for the driver to complain to one of his supervisors.[16]  Drivers also regularly call the dispatch office to ask for certain assignments, to request route changes, or to request extra work.  Plaintiff's testimony indicates that the dispatch office accommodates plaintiff's requests when they can, and plaintiff acknowledged that the dispatch office has never denied any of his special requests for discriminatory reasons.[17]

During his employment with defendant, plaintiff had two accidents, one in 1999 and another in 2004, both of which were ruled as "preventable" by Air Products. He was issued written disciplinary letters after each accident.[18]

On December 6, 2001, plaintiff received a Driver Observation Report from Steve Momberg, Air Products' safety training supervisor.  The report indicated that plaintiff had failed to perform several required safety tasks during one of that day's deliveries.[19]  Plaintiff acknowledged making the mistakes cited in the report because he was "in too big a hurry."[20]  Despite that acknowledgment, plaintiff engaged in a verbal altercation with Momberg because he did not like Momberg's attitude.

---

[16]*Id.* at 226.

[17]*Id.* at 173-74.

[18]*Id.* at 107-12; *see also* defendant's evidentiary submission, at Exhibits 4 & 5 (December 2, 2009 and September 2, 2004 warning letters).

[19]Defendant's evidentiary submission, at Exhibit 6 (December 6, 2001 Driver Observation Report).

[20]Stevens Deposition, at 115.

7

Plaintiff testified that Momberg "got smart" with him, so he "got smart" back with Momberg.[21]   After that incident, Mark Watkins, the Site Manager of the Decatur facility, met with plaintiff and advised him to abide by safety regulations and to refrain from hostile behavior toward others in the workplace.[22]

In February of 2004, a driver named Donnie Key, whose age is not clearly reflected in the record, reported to Watkins that plaintiff had been harassing him by continually calling him "baby" or "crybaby," making baby noises, and rubbing his eyes as though he were pretending to cry.  Key suspected that plaintiff was harassing him in this manner because Key had taken time off from work to address some personal problems.  Watkins met with plaintiff to inform him that his behavior was unprofessional and needed to stop.  Despite that warning, Key again reported to Watkins in March of 2004 that plaintiff continued to call him a baby and make baby noises when around Key.  Watkins met with plaintiff and Key the next day to admonish both men that such behavior would not be tolerated.  In July of 2004, Key reported that plaintiff's harassing behavior continued.  In addition to calling him a "baby," plaintiff had also begun referring to Key as "Little Mark," which Watkins understood to be a derogatory reference to him as a member of management.  Watkins met with both Key and plaintiff again, and once more advised both men that further

---

[21]*Id.* at 116-18.
[22]*Id.* at 104-05, 118-20.

harassing or otherwise unprofessional behavior would not be tolerated.  During his meetings with Watkins, plaintiff denied making the "baby" comments, but he admitted calling plaintiff "Little Mark."[23]   During his deposition, plaintiff acknowledged talking about "crybabies" and wiping his eyes in the presence of other drivers, but he denied addressing those comments and gestures specifically to Key.[24] In approximately September of 2007, Key reported to Watkins that plaintiff had continued to call him a baby and make baby noises since 2004, although Watkins had not reported any continued harassment between 2004 and 2007.[25]

Also in approximately September of 2007, another driver, Chad Link, who was substantially younger than plaintiff, reported that plaintiff had cursed at him and attempted to back over him with his truck.  When Watkins met with plaintiff and Link, plaintiff denied trying to hit Link with his truck, but he did admit to saying "fuck you" to Link.  Watkins again informed plaintiff that his behavior was unacceptable.[26]

Frustrated with the complaints that other employees had been making against him, plaintiff contacted John Brouillette, a company human resources representative.

---

[23]Watkins Affidavit, at ¶¶ 7-9; Stevens Deposition, at 77-83, 136-37.

[24]Stevens Deposition, at 77-78.

[25]Watkins Affidavit, at ¶ 11.

[26]*Id.* at ¶ 10; Stevens Deposition, at 143-49.

Brouillette already was scheduled to visit the Decatur facility in mid-September on another matter, so he agreed to also address plaintiff's issues while he was there.[27] Brouillette first met with plaintiff, Link, Watkins, and Peter LaFerrara, another Site Supervisor at the Decatur facility who reported to Watkins, but who also had supervisory authority over plaintiff. Link reiterated that plaintiff had tried to run over him and had said "fuck you" to him, and plaintiff informed the others that Link had been harassing him by pointing to his genitals and looking at him. Brouillette told both plaintiff and Link that they could be fired for their behavior, and plaintiff said, "Well, if you fire me, you had better fire [Link], too." Brouillette, Watkins, and LaFerrara then excused plaintiff from the meeting and met with Link individually. When Link emerged from that individual meeting, he apologized to plaintiff, although plaintiff did not think the apology was sincere. Plaintiff did not apologize to Link because he "didn't have nothing to apologize to him about."[28] Before plaintiff left the meeting, he was informed that any further unprofessional conduct or disputes with other employees could result in the termination of his employment.[29]

Brouillette then met with plaintiff, Watkins, La Ferrara, and Donnie Key. Key

---

[27]Stevens Deposition, at 149-50. Watkins stated that it was the company's decision to conduct an investigation into plaintiff's alleged harassment of other employees. Watkins Affidavit, at ¶ 12. Because plaintiff testified that he was the one who contacted Brouillette, however, the court will consider that version of events as true for summary judgment purposes.

[28]Stevens Deposition, at 149-56.

[29]*Id.* at 160-61.

shared his complaints about plaintiff's allegedly harassing behavior.  Key claimed that plaintiff's harassment of him was continual, but plaintiff denied having any contact with Key since 2004.  Brouillette told plaintiff and Key they needed to "start over" and "move forward" from their disputes.  Brouillette, Watkins, and LaFerrara then met with Key individually, but plaintiff does not know what occurred during that meeting because he left before it began.[30]

In addition to his disputes with Link and Key, plaintiff engaged in various altercations with other drivers.  Soon after plaintiff started working for Air Products, he had a "run-in" with Buddy Suggs, who is older than plaintiff.  Suggs repeatedly made fun of plaintiff by calling him "Shorty."  Plaintiff reported Suggs' behavior to Watkins, but the harassment nonetheless continued.[31]  Additionally, in 2000 or 2001, plaintiff took offense when David Young, who also is older than plaintiff, "dropped his britches and started putting his shirt tail in his drawers."  Plaintiff told Young he had "better not do it again," or else plaintiff would "beat the hell out of him."[32]  Also in approximately 2000, plaintiff engaged in a verbal argument with a driver named Paul Rankin, who was ten or fifteen years younger than plaintiff.  Rankin confronted plaintiff because he was unhappy about plaintiff trying to unload one of his deliveries

---

[30]*Id.* at 156-59.

[31]*Id.* at 124-27.

[32]*Id.* at 128-31.

11

at the same time as Rankin.[33]  Finally, plaintiff engaged in repeated squabbles —
some good-natured and some not — with a driver named Paul Dooley, who is older
than plaintiff.  The squabbles usually were over who had received the better work
assignment.[34]  Watkins stated that he often had to "'referee' schoolyard squabbles"
between plaintiff and other drivers.[35]

Safety is an important issue for all employees at Air Products, because the
company deals in the manufacture and transportation of potentially dangerous
chemicals.  One safety procedure every Air Products employee is required to follow
is the submission of at least four written "Accident Prevention Techniques"
("APT's") each month.  Watkins stated that "APTs are safety techniques which
correct a potentially hazardous situation.  They do not have to be complicated.  An
easy example would be: 'I saw a file drawer was open, which could have harmed
someone.  I closed the drawer.'"[36]

In March of 2008, plaintiff submitted the following APTs:

•      "on 3-14-08 my 2nd trip to daikin was canceled without notice I talked
to RON while reloading he said I would have a balance and couldn't

---

[33]Stevens Deposition, at 168-70.

[34]*Id.* at 170-75.

[35]Watkins Affidavit, at ¶ 6.

[36]*Id.* at ¶ 20.

send it!!! yet he sent two other loads in the afternoon who brought back product!!!!! seems like a lot of FAVORITISM to me."

- "dispatch giving me short work days during week so they will have work for weekend to justify new start times"

- "owl head was at 93 ins. when I got there this morning so this load could have went a lot sooner looks like logistics was saving it for me so they could give me another short work day!!!!!!!!!"

- "IOC was at 58 ins when I arrived logistics is taking risk of running customer out by letting them get this low this trip should have been sent sooner"

- "our old start times and off days had worked good for a lot of years this change caused a lot of bad attitudes maybe we should make drivers happy and have a change in MANAGEMENT!!!!!!!"[37]

For the first and last APTs listed, plaintiff typed only question marks in the blank intended for the description of the action taken on the issue.  For the second APT, he stated that the action taken was "gives me a atta'TUDE."  For the third APT listed, he stated that the action taken was "so much for efficient dispatching."  And for the fourth, plaintiff stated, "this type of dispatching does nothing but cause bad

---

[37]Defendant's evidentiary submission, at Exhibit 14.

attitudes."[38]

Watkins and LaFerrara met with plaintiff to inform him that his APT writeups were inappropriate.  They also informed plaintiff that they would not tolerate him playing any more "games."  Air Products decided to leave plaintiff off of the delivery schedule until the following week, so they could consider how to handle the situation. Watkins and LaFerrara told plaintiff it appeared his job might not be the right one for him, and they asked plaintiff to spend some time considering whether he should remain in the job.  Plaintiff promised his supervisors that he would change his attitude in the future.[39]

In addition to verbally counseling plaintiff, Air Products issued plaintiff a written warning letter on April 14, 2008, stating:

> This letter serves as a written warning, as the result of your recent unsatisfactory job performance, specifically related to not meeting the required monthly submission of appropriate APT's as well as your decision to use the APT system for something in which it is not intended [sic].  In addition, let me remind you this discipline follows a series of unprofessional incidents management reviewed and discussed with you and other drivers late last year that will not be tolerated.
>
> Roger, this performance issue has been discussed with various levels of management and we are very disappointed in your behavior. It is incumbent upon you to take this opportunity to reflect on recent incidents and insure [sic] you put yourself in a position that this type of

---

[38]*Id. See also* Stevens Deposition, at 94, 179, 194-95.

[39]Stevens Deposition, at 209-13.  *See also* defendant's evidentiary submission, at Exhibit 16 (April 11, 2008 email from Mark Watkins).

performance will cease immediately.. [sic]

You should be aware[,] however, that further unsatisfactory job performance will result in further corrective action, up to and including discharge.[40]

Plaintiff did not abide by his promise to change his attitude for very long.[41]  On December 10, 2008, plaintiff called Patrick Flower, who worked in the dispatch office, to complain about being assigned one particular delivery more often than he would have liked.  Plaintiff acknowledged being impolite to Flower, but he also stated that Flower "got smart" with him.  Flower offered excuses for why the assignments were made the way they were, but plaintiff was not satisfied with Flower's reasoning.  Plaintiff ended the conversation by hanging up on Flower.[42]  Flower reported plaintiff's telephone call to Watkins and LaFerrara in an email stating:

I have never had a problem with Roger Stevens in the past.  He seems to have a problem going to the small tank at PPG.  This tank is erratic and has fallen on him a few times.  A few times in the past week he decided to question why Donnie Key didn't have a certain trip he had and why Maughon has the trips he does.

I have no problem making Maughon do local trips if this is what you want to do.  It was just easier giving him the layovers when they came up because he always has his bag.  A lot of short trips come up in

---

[40]Defendant's evidentiary submission, at Exhibit 17.

[41]Stevens Deposition, at 213.

[42]*Id.* at 222-24.

the morning, and in fact last week, I gave Roger four locals in one day!
This is a respectable days [sic] work in my book.  Roger does not
appreciate my efforts and I do not appreciate him trying to intimidate
me.

> I foolishly tried to explain where I was coming from to him and
then he hangs up on me.  <u>I will not tolerate</u> drivers questioning the
dispatch and the[n] <u>hanging up on me.</u>  If Mr. Stevens would have liked
to have a civilized discussion, this would have been fine.  Please speak
to Mr. Stevens about his insubordinate behavior.  The next time he calls
me I expect the mutual respect that I give him and all other drivers.  He
must keep his commentary on the dispatch to himself and if he has any
issues, go through the proper channels.[43]

Plaintiff acknowledged that he was supposed to lodge his complaint about dispatch

assignments with his supervisors, instead of directly to a dispatch employee, but he

chose not to do so because he felt like complaining directly to dispatch was the only

way to get results.[44]

A different dispatcher independently scheduled plaintiff for the same trip to the

same customer the following morning, December 11, 2008.[45]  Plaintiff reported to

work on the morning of December 11, as scheduled, despite the fact that his stomach

had been upset the night before.[46]  However, after plaintiff arrived at work, checked

his schedule for the day, and started to prepare his truck, he got sick and needed to

---

[43]Defendant's evidentiary submission, at Exhibit 18 (emphasis in original).

[44]Stevens Deposition, at 226.

[45]*See* defendant's evidentiary submission, at Exhibits 19 & 20.

[46]Stevens Deposition, at 46-48.

16

leave.  He tried to call the dispatch office from work, but he was unable to reach them, so he went home and called from there instead.[47]

On December 15, 2008, LaFerrara received a report from driver Chris Maughon that plaintiff had cursed at him and tried to intimidate him for no reason.[48]

Also on December 15, 2008, LaFerrara contacted plaintiff to inform him that he, Watkins, and Brouillette wanted to meet with plaintiff the next day.  During that meeting, none of the management or Human Resources officials present would listen to plaintiff's side of the story, and none of them would respond to his complaints about dispatch assignments.  Brouillette informed plaintiff he could either resign, retire, or be fired.  Plaintiff refused to resign or retire, so Brouillette collected plaintiff's employee badge, key card and credit card, and told plaintiff to collect his personal belongings from his locker.[49]  Watkins told plaintiff he would need to confer with LaFerrara and Brouillette before making a final decision, but, given plaintiff's history of conflict with other employees, the recent incidents probably would be the "last straw."[50]  Watkins telephoned plaintiff on December 18, 2008, to inform him that Air Products had made a final decision to terminate plaintiff's employment,

---

[47]*Id.* at 243-44.

[48]Watkins Affidavit, at ¶ 22.

[49]Stevens Deposition, at 242-45.

[50]Watkins Affidavit, at ¶ 23.

effective that day, for poor job performance.[51]

Because plaintiff alleges that defendant treated Chad Link more favorably than it treated him, the court will now discuss Link's employment and disciplinary history with defendant. Air Products hired Chad Link as a truck driver at its Decatur facility on approximately May 20, 2005, when Link was twenty-nine years of age.[52] Sometime in 2006, Link began taking days off work and arriving late to work on a regular basis. Watkins confronted Link about his declining attendance, and Link informed Watkins that he had become engaged in a time-consuming divorce and custody battle involving his newborn and an older child with special needs.[53] Watkins assured Link that the company would try to accommodate his situation as much as possible. He also advised Link that, to the extent some of his family issues were medical in nature, he could take a leave of absence through the Family and Medical Leave Act (FMLA). However, Link never took or attempted to take any FMLA leave.[54]

At some point during Watkins' September 2007 meetings with plaintiff and Link, plaintiff complained about Link's tardiness. Plaintiff was annoyed by Link's

---

[51]Stevens Deposition, at 249.

[52]Watkins Affidavit, at ¶ 13; *see also* defendant's evidentiary submission, at Exhibit 22 (May 20, 2005 offer letter to Chad Link).

[53]Watkins Affidavit, at ¶ 14.

[54]*Id.* at ¶ 15.

tardiness because it interfered with plaintiff's own job performance when plaintiff would have to wait on Link to finish loading his truck before he could load his own truck.[55]   Additionally, because the company was trying to accommodate Link's situation, some of plaintiff's own start times were changed to times he considered less favorable or convenient.  In fact, Air Products sometimes switched plaintiff's and Link's start times in order to accommodate Link's situation.[56]  Because of plaintiff's complaints, Watkins reviewed Link's records and discovered that he had been at least thirty minutes late to work 54% of the time between March and September of 2007. Watkins advised Link that, despite his personal problems, he would need to arrive to work on time more often, and that if he could not do so, he should take FMLA leave. During the six-month period following Watkins' warning to Link, Link arrived to work on time 20% more often.  Watkins was satisfied with the improvement in Link's punctuality until some point in 2008, when Air Products noticed that Link's productivity had begun to slip.  Watkins asked Link to begin providing medical documentation to support any health-related absences, and he also reminded Link that the company had support resources that were available to him.[57]

---

[55]Stevens Deposition, at 31-36, 257-58.

[56]*Id.* at 64-65.

[57]Watkins Affidavit, at ¶¶ 18-19.

19

Air Products terminated Link's employment due to a safety violation in 2009.[58] During an unannounced driver observation, Momberg observed Link sleeping in the cab of his truck after he had begun unloading a tank of liquid oxygen at a customer's delivery site.  Because Link failed to appropriately monitor the transfer of oxygen, the product spewed out of the truck after the customer's tank was filled.[59]

### III. DISCUSSION

Plaintiff alleges the following in his complaint: "Roger Stevens (age 57) was terminated for poor job performance.  Chad Link (age 32) who's [sic] job performance was not as proficient as mine was never disciplined for his poor job performance."[60]   Although plaintiff does not explicitly mention the Age Discrimination in Employment Act ("ADEA") in his complaint, the court construes plaintiff's complaint as asserting claims under that statute.

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The protections of the ADEA extend to those individuals who "are at least 40 years of age."  29 U.S.C. § 631(a).

---

[58]*Id.* at ¶ 19.

[59]*See* defendant's evidentiary submission, at Exhibit 27 (Driver Observation Report and Summary).

[60]Complaint, at 2.

Plaintiff does not claim to have direct evidence of age discrimination in the form of disparaging age-related comments.  Thus, he must prove his claims with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this analysis, plaintiff must first establish a *prima facie* case of age-based disparate treatment, which creates a presumption of discrimination.  To rebut the presumption, defendant then must articulate a legitimate, nondiscriminatory reason for the disputed employment action.  If defendant does so, the presumption of discrimination drops from the case, and the burden shifts back to plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.  Additionally,

> the Supreme Court [has] ruled out the idea of a "mixed motive" ADEA claim, instead requiring plaintiffs to show that age was the "but for" cause of an employment action. [*Gross v. FBL Financial Services, Inc.,* – U.S. –, 129 S. Ct. 2343, 2350 (2009)].  The ADEA requires that "age [be] the 'reason' that the employer decided to act." *Id.* Because an ADEA plaintiff must establish "but for" causality, no "same decision" affirmative defense can exist:  the employer either acted "because of" the plaintiff's age or it did not. *Id.* at 2352 ("The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.").

*Mora v. Jackson Memorial Foundation, Inc.,* 597 F.3d 1201, 1204 (11th Cir. 2010).

21

Even if plaintiff could establish a *prima facie* case of age discrimination,[61] he still could not prevail on his claims, because he cannot demonstrate that defendant's proffered legitimate reasons for the disciplinary actions taken against him actually were a mere pretext for age discrimination. Furthermore, plaintiff cannot prove that age discrimination was the "but for" cause of his termination and the other disciplinary actions taken against him.

## A.    Pretext

Defendant asserts that it

> terminated Plaintiff after a long series of incidents all related to plaintiff's poor attitude. . . .  As far back as 2001, Plaintiff had raised his voice and become hostile with [Air Products'] safety person giving him negative feedback after a driver observation, despite the fact that Plaintiff agreed with the unsafe conduct cited in the observation itself. . . .  Donnie Key and Chad Link reported ongoing harassment by Plaintiff between 2004 and 2007. . . .  Mr. Watkins also received other reports of incidents between Plaintiff and six other employees over the course of his employment, and in most instances, Plaintiff seemed to be unprovoked.
>
> In March 2008, Plaintiff abused an important safety improvement process, choosing to vent his frustration with the dispatch process instead of reporting accident prevention techniques as required. . . .  This is despite the fact that [the] dispatch process is a process which Plaintiff

---

[61]To establish a *prima facie* case of age discrimination, plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Morton v. Astrue*, 380 Fed. Appx. 892, 894 (11th Cir. 2010) (citing *Maynard v. Board of Regents of Division of University of Florida Department of Education*, 342 F.3d 1281, 1289 (11th Cir.2003)).

admits is balanced, and by which, at times, he received more favorable
trips over other drivers. . . .  This is also despite the fact that Plaintiff
had previously been warned that his poor attitude could result in his
termination. . . .  Although Plaintiff was worried that he was going to be
fired for his insubordination and poor behavior at that time, [Air
Products] chose to give him a final warning. . . .

> Plaintiff's "bad attitude" eventually resulted in his termination in
December 2008.  Upset that he had been put on an undesirable trip,
Plaintiff had called the assigning dispatcher, raised his voice to him and
tried to intimidate him, and then hung up on him when that dispatcher
was trying to explain the situation in earnest. . . .  When a different
dispatcher put Plaintiff on the same trip the next day, Plaintiff called in
sick from the Decatur facility and left dispatch scrambling to find a
replacement driver to cover what could have been a serious liability for
[Air Products]. . . .[62]

Because defendant has offered legitimate, non-retaliatory reasons for

disciplining plaintiff and, ultimately, terminating his employment, plaintiff can

survive summary judgment on his ADEA claim only if he comes "forward with

evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons

given by the employer were not the real reasons for the adverse employment

decision."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)

(citing *Burdine*, 450 U.S. at 256; *Green,* 411 U.S. at 804).  Plaintiff's burden at this

step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered

nondiscriminatory reasons to permit a reasonable factfinder to conclude that the

employer's proffered 'legitimate reasons were not what actually motivated its conduct

---

[62]Doc. no. 12 (defendant's brief), at 24-25 (defendant's citations to the record omitted).

. . . .'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Chapman v. AI Transport*, 229 F.3d 1023, 1024-25 (11th Cir. 2000) (*en banc*).   Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Plaintiff points to the following facts to support his claims:  (1) that he has a long, successful history of employment as a truck driver; (2) that Air Products offered to settle the case after he filed an EEOC charge; (3) that management regularly allowed Chad Link to arrive late to work; (4) that management switched his start times with Chad Link's; (5) that two emails Chad Link sent to management officials about plaintiff were a violation of Air Products' policy; (6) that Chad Link took more sick days off than plaintiff, but was not terminated; (7) that Air Products violated Federal Motor Carrier Safety Regulations; (8) that Air Products lied to the EEOC about dispatchers visiting the Decatur facility; and (9) that Air Products took the side of Chad Link, Donnie Key, and Chris Maughon — all of whom are younger than plaintiff — in every dispute that arose.  As discussed more fully below, these facts

(whether considered individually or collectively) do not rebut defendant's proffered reasons "head on." *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007)  ("The plaintiff must meet the reason proffered head on and rebut it.").

### 1.    Irrelevant Facts Unrelated to Defendant's Proffered Reasons

Some of the facts and assertions offered by plaintiff are not even related to defendant's proffered legitimate reasons, and in any event, do not call those proffered reasons into question.  For example, plaintiff's positive employment history is irrelevant, because plaintiff was not terminated for anything that occurred earlier in his employment history.  His prior successes do nothing to discredit defendant's assertion that plaintiff's bad attitude, at some point, began causing problems with his work.  Likewise, any settlement offer that may have been made by defendant's attorneys when plaintiff's claim was before the EEOC is irrelevant.  Not only did plaintiff fail to provide any details of this alleged proposed settlement, but he also cannot demonstrate how the alleged proposed settlement serves to discredit any of defendant's proffered legitimate reasons.

### 2.    Federal Motor Carrier Safety Regulations

Plaintiff asserts that defendant violated Regulation 392.3 of the Federal Motor Carrier Safety Administration when it terminated him after he called in sick on December 11, 2008.  That regulatory provision provides:

25

> No driver shall operate a commercial motor vehicle, and a motor
> carrier shall not require or permit a driver to operate a commercial motor
> vehicle, while the driver's ability or alertness is so impaired, or so likely
> to become impaired, through fatigue, illness, or any other cause, as to
> make it unsafe for him/her to begin or continue to operate the
> commercial motor vehicle. However, in a case of grave emergency
> where the hazard to occupants of the commercial motor vehicle or other
> users of the highway would be increased by compliance with this
> section, the driver may continue to operate the commercial motor
> vehicle to the nearest place at which that hazard is removed.

49 C.F.R. § 392.3.  Defendant did not violate this provision because defendant did

not require plaintiff to work when he was sick or otherwise impaired.  Defendant has

never asserted that plaintiff should have worked while he was sick.   Instead,

defendant disbelieved plaintiff's allegations of sickness and considered his absence

an act of insubordination.  Accordingly, regulation 392.3 has nothing to do with the

termination of plaintiff's employment.

###   3.   False Statements to the EEOC

Plaintiff asserts that defendant falsely stated in its position statement to the

EEOC that no dispatchers had ever been to the Decatur facility.  This assertion has

no impact on the success of plaintiff's claims for several reasons.  First, defendant

never made such a statement to the EEOC.  Defendant's EEOC response included the

following paragraph:

> Mr. Stevens' claim that he received less desirable work
> assignments because of his age is equally meritless.  Dispatch is handled

26

> centrally out of the Company's Allentown, Pennsylvania facility.
> Approximately five different dispatchers dispatch for Decatur in a given
> week, none of whom have met Mr. Stevens or the other drivers in
> Alabama and none of whom know the ages of the drivers they route.[63]

Defendant stated that none of the dispatchers had met the drivers in Alabama, not that the dispatchers had never been to Alabama. Furthermore, plaintiff has offered only a bare allegation, not any evidence, that certain dispatchers have, in fact, been to Alabama. Finally, this allegation has nothing to do with any of defendant's proffered legitimate reasons for disciplining plaintiff and terminating his employment.

### 4.    Chad Link as a Comparator

Most of plaintiff's remaining arguments are founded on him being treated differently from Chad Link, who was substantially younger than he was. According to plaintiff, Link arrived late to work, took off too many sick days, and sent emails about plaintiff that violated company policy, but he was not disciplined or terminated like plaintiff was. In fact, according to plaintiff, Link convinced Air Products to switch his start times with plaintiff's even though plaintiff had more seniority. Again, plaintiff's arguments carry no weight, because Link as not similarly situated to plaintiff for purposes of a disparate treatment analysis.

The following is a concise summary of the Eleventh Circuit's guidance on what

---

[63]Doc. no. 15 (plaintiff's brief), Exhibit 7 (excerpt from April 3, 2009 letter from Air Products to the EEOC), at n.4.

is required to show that two employees are similarly situated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis supplied).

Thus, in the context of a disparate discipline claim, a plaintiff must show that employees outside her protected class were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways. *Id.; see also, e.g., Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed."). "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998) (holding that "a Title VII plaintiff

cannot succeed in proving that [he] was intentionally discriminated against if [he] does not establish a prima facie case of discrimination").

It is true that Link demonstrated repeated tardiness and absences from work, but those facts do not render him a proper comparator.  Plaintiff was not disciplined or terminated for absences or tardiness; he was disciplined and terminated for his poor attitude.  Furthermore, Link's absences and tardiness were the result of personal and health-related problems he disclosed to his supervisors, who committed to make an effort to accommodate his situation.  Plaintiff, on the other hand, experienced no such personal and health problems and requested no such accommodation from defendant.  Defendant's decision to switch plaintiff's and Link's start times — if indeed that fact can be established by the record[64] — also was an accommodation of Link's personal and medical situation (a situation plaintiff did not share).

Finally, plaintiff cannot establish that Link sent any emails in violation of company policy.  The emails he references both involve Link complaining to Watkins

---

[64]Plaintiff's testimony is not actually that defendant directly switched plaintiff's and Link's schedules.  Instead, plaintiff testified that defendant switched the 3:00 a.m. start time to the weekend shifts, and the 1:00 a.m. start time to the weekday shifts.  The bidding process remained the same, *i.e.,* plaintiff, who had more seniority, was able to bid on the start time he wanted before Link did.  Plaintiff chose to bid on neither the 1:00 a.m. nor the 3:00 a.m. start time, because he did not want to work at 1:00 a.m., and he did not want to work on weekends.  There is no evidence, other than plaintiff's plain speculation, that the 1:00 a.m. and 3:00 a.m. start times were switched because of Chad Link.  *See* Stevens Deposition, at 63-65.

and LaFerrara about plaintiff's behavior.[65]  It is not entirely clear what policy plaintiff believes Link violated by sending these emails, but the court concludes it is most likely the policy against using the company's email to send "illegal, defamatory, offensive, or harassing messages or files."[66]  This policy cannot reasonably be construed to prevent one employee from sending an email message to management officials for the purpose of complaining about another employee.  Furthermore, even if Link's emails had constituted a policy violation, that violation would be irrelevant to the consideration of Link as a comparator, because plaintiff was not disciplined or terminated for sending emails in violation of company policy.

### 5.    Management Siding with Younger Employees

As an initial matter, there simply is no evidence that Air Products management sided with younger employees Link, Key, and Maughon on "every single issue," as plaintiff asserts.[67]  The record reflects that when management officials addressed the disputes between plaintiff and these men, they encouraged *both* sides to contribute to the resolution.  Furthermore, many of the incidents for which plaintiff was disciplined, and ultimately terminated, had nothing to do with Link, Key, or

---

[65]*See* doc. no. 15 (plaintiff's brief), at Exhibit 2 (October 22, 2007 email) and Exhibit 3 (September 3, 2007 email).

[66]*See* doc. no. 15 (plaintiff's brief), at Exhibit 4 (presumably an excerpt from the Air Products company handbook, Bates Stamp No. APCI001679).

[67]Plaintiff's brief, at 5.

30

Maughon.  Sometimes, in fact, plaintiff engaged in disputes with older employees, including Buddy Suggs, David Young, and Paul Dooley.

In summary, plaintiff has failed to put forward any evidence to discredit defendant's proffered legitimate reasons for disciplining plaintiff and terminating his employment, and he has not demonstrated that those proffered reasons actually are a pretext for age discrimination.

## B.    "But For" Causation

Additionally, even if plaintiff could establish that defendant was motivated in part by his age when it decided to discipline him and terminate his employment,[68] he cannot demonstrate that age discrimination was the "but for" cause of any discipline he received.  As an initial matter, the evidence already discussed in this opinion demonstrates that defendant disciplined plaintiff and terminated his employment because of plaintiff's bad attitude and resulting poor job performance, not because of his age.  Furthermore, plaintiff as much as acknowledged in his deposition that he was not discriminated against because of his age.  He stated, "I didn't claim [defendant] fired me for my age; I said they discriminated against me because of my age, because Chad — so Chad Link could have what he wanted."[69]  Defendant's alleged general discrimination of plaintiff impacted his job by causing him to have

---

[68]As set forth above, plaintiff has little evidence of discriminatory motive on defendant's part.
[69]Stevens Deposition, at 220.

31

a bad attitude, but it did not otherwise affect his employment.[70]   Plaintiff also acknowledged that he could have been fired for the following reasons: (1) because a group of drivers, including some who were older than plaintiff, wanted him fired; (2) because of his personality;[71] (3) because he complained about management officials, including Watkins and LaFerrara, in his APTs;[72] and (4) because he called in sick to work on December 11, 2008.[73]   Furthermore, plaintiff admitted in his deposition that the disciplinary actions taken against him for fighting with Momberg and for drafting improper APTs were not the result of age discrimination.[74]   He also stated that he "couldn't get away with nothing, and *all* the other drivers [presumably including drivers who were older than plaintiff] would get away with whatever they wanted to."[75]

In summary, the evidence, including plaintiff's own characterization of his claims in his deposition testimony, indicates that age discrimination was not the reason for plaintiff's termination, or for any of the other disciplinary actions directed to him.  Rather, plaintiff's theory seems to be more that management favored other

---

[70]*Id.* at 221.

[71]*Id.* at 250.

[72]*Id.* at 250-51.

[73]*Id.* at 142.

[74]Stevens Deposition, at 124-25, 217.

[75]*Id.* at 218 (emphasis supplied).

employees (including both older and younger employees) over him, that the less favorable treatment he received caused him to have a bad attitude, and that the bad attitude ultimately got him fired.  There are two fatal flaws in this theory.  First, if both younger and older employees were treated more favorably than plaintiff, then there was no age discrimination.  Further, there is no authority to support the notion that Air Products should be held liable for invoking a bad attitude that ultimately got plaintiff fired.  Plaintiff simply does not have sufficient evidence to support a claim of age discrimination, and for that reason, summary judgment is due to be granted in defendant's favor.

## IV. CONCLUSION AND ORDER

In accordance with the above, the court finds that there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter of law.  Accordingly, defendant's motion for summary judgment is GRANTED, and it is ORDERED that all of plaintiff's claims are DISMISSED with prejudice.  Costs incurred herein are taxed as paid.  The Clerk of Court is directed to close this file.

DONE this 22nd day of February, 2011.

_____
United States District Judge

33